FILED

2007 Aug-13  AM 10:47
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### WESTERN DIVISION

| | |
|---|---|
| **ALABAMA CREDIT UNION,**                                                      ) | |
| )| |
| **Plaintiff,**                                                                 ) | |
| )| |
| **v.**                                                                         ) | |
| )| |
| **THE CREDIT UNION OF ALABAMA**                                                ) | |
| **FEDERAL CREDIT UNION, formerly**                                             ) | |
| **known as BF Goodrich Employees federal**                                     ) | |
| **Credit Union; LOCKLEAR CHRYSLER**                                            ) | |
| **JEEP DODGE, DON DRENNEN**                                                    ) | |
| **CHRYSLER JEEP,**                                                             ) | |
| )| |
| **Defendants.**                                                                ) | **CV 05-B-1692-W** |
| )| |
| **THE CREDIT UNION OF ALABAMA**                                                ) | |
| **FEDERAL CREDIT UNION,**                                                      ) | |
| )| |
| **Counter Claimant,**                                                          ) | |
| )| |
| **v.**                                                                         ) | |
| )| |
| **ADMINISTRATOR T. GLENN**                                                     ) | |
| **LATHAM; ALABAMA CREDIT UNION,**                                              ) | |
| )| |
| **Counter Defendants,**                                                        ) | |
| )| |
| **THE CREDIT UNION OF ALABAMA**                                                ) | |
| **FEDERAL CREDIT UNION,**                                                      ) | |
| )| |
| **Counter Claimant,**                                                          ) | |
| )| |
| **v.**                                                                         ) | |
| )| |
| **ADMINISTRATOR T. GLENN**                                                     ) | |
| **LATHAM; ALABAMA CREDIT UNION,**                                              ) | |
| )| |
| **Counter Defendants.**                                                        ) | |
| )| |

## MEMORANDUM OPINION

This case is currently before the court on counterclaim defendant Alabama Credit Union's ("ACU") Motion for Summary Judgment, (doc. 77),[1] with respect to all counterclaims asserted against it by counterclaim plaintiff, The Credit Union of Alabama Federal Credit Union ("TCUAFCU").  Upon consideration of the record, the submission of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that ACU's Motion for Summary Judgment is due to be granted as to all claims.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F. 2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144,157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. V. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

2

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* At 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in the favor of the non-moving party.  *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every reasonable inference.  *See Brown v. City of Clewiston*, 848 F. 2d 1534, 1540 n. 12 (11th Cir. 1988).

## STATEMENT OF FACTS

### *The Parties*

Alabama Credit Union ("ACU") is an Alabama state-chartered credit union with its principal place of business in Tuscaloosa, Alabama.  (Doc. 69 at 5.)  The Federal Credit Union of Alabama Federal Credit Union ("TCUAFCU") is a federally-chartered credit union with its principal place of business in Tuscaloosa, Alabama.  (*Id.*)  TCUAFCU formerly operated under the name, "B.F. Goodrich Employees Federal Credit Union."  (*Id.*)

### *TCUAFCU's Name Change*

In 2005, B.F. Goodrich Employees Federal Credit Union announced that it was changing its name to "The Credit Union of Alabama Federal Credit Union."  (Doc. 44 at

3

12.)  The National Credit Union Administration ("NCUA") is the federal agency that approves name changes of federally-chartered credit unions.  (Doc. 43, Ex. A.)  Alonso A. Swann, III is the Regional Director of NCUA's Region III, which includes all federally-insured credit unions in Alabama.  (Doc. 69 at 5.)  As Regional Director, Swann determines whether to grant or deny a federal credit union's request to change its name. (*Id.*)  On March 25, 2005, Swann issued a certificate granting B.F. Goodrich Employees Federal Credit Union's request to officially change its name to The Credit Union of Alabama Federal Credit Union.  (*Id.*)  On March 26, 2005, TCUAFCU publicly announced the name change.  (Doc. 80 at 2.)

ACU officers and directors first learned of the name change on Sunday, March 27, 2005.  (Doc. 80 at 2.)  On the following day, ACU's lawyer, Ben Hayley, wrote a cease and desist letter to TCUAFCU protesting the new name.  (*Id.*)

*ACU's Registration of Domain Names*

On March 28, 2005, ACU placed an order with Verio.com for registration of a number of domain names, such as "thecreditunionofalabama.info," "thecreditunionofala.com," and "thecreditunionofalabama.biz."[2]  (Doc. 13 at 12-13.) ACU also registered domain names containing the word, "federal," although ACU is not a federally-chartered credit union.  (Doc. 13 at 13.)  All of the domain names ordered on March 28, 2005 point to blank pages.  (Doc. 80 at 4.)  Prior to its name change,

_____

[2]ACU registered at least sixty-four domain names, which are listed in TCUAFCU's Answer and Counterclaims, (doc. 13).

4

TCUAFCU registered five domain names for itself.  (*Id.*)  TCUAFCU did not intend to register any other domain names for itself.  (Doc. 80 at 5.)

*Objections to the Name Change*

ACU, through its President Steve Swofford, protested TCUAFCU's name change. (Doc. 80 at 5; doc. 89 at 4.)  The NCUA rejected ACU's objection, and refused to rescind its approval of the name change.  (Doc. 80 at 5; doc. 89 at 11.)

The Administrator of the Alabama Credit Union Administration ("ACUA") also protested the name change.  (Doc. 89 at 4.)  The ACUA was created by statute to administer Alabama laws regulating or otherwise relating to credit unions in Alabama. (Doc. 69 at 4.)  The Administrator of the Alabama Credit Union Administration ("Administrator") is appointed by the Governor to serve as the chief executive officer of the ACUA.  (*Id.*)  At the time of TCUAFCU's name change, T. Glenn Latham was Administrator.  (*Id.*)  As Administrator, Latham was responsible for the regulation of state-chartered credit unions in Alabama.  (*Id.*)  Latham was also responsible for the safety and soundness of state-chartered credit unions.  (*Id.*)

Latham learned of the name change on or before April 1, 2005 from his Assistant Administrator.  (Doc. 69 at 6.)  Latham spoke with ACU President Steve Swofford about the name change.  (Doc. 89 at 4.)  Latham told Swofford that he would call Tim Hornbrook, Associate Regional Director of the NCUA, to ascertain whether anything could be done about the name change.  (Doc. 69 at 6.)  Latham called Hornbrook and told

5

him that the name change would cause confusion and was not in the best interest of

TCUAFCU or ACU.  (*Id.*)  On March 31, 2005, Latham wrote a letter to Hornbrook

opposing the name change and requesting a meeting with Hornbrook and Swann.  (Doc.

69 at 7.)  Swann took no action with regard to the name change as a result of Latham's

objections to the NCUA.  (*Id.*)  On May 16, 2005, Swann carbon-copied Latham to a

letter to Swofford, in which Swann stated, "I have decided not to rescind the name change

approval dated March 15, 2005."  (Doc. 69 at 7-8.)  TCUAFCU's name change was never

rescinded as a result of Latham's or ACU's objections.  (*Id.*)

### Indirect Lending

Indirect Dealer Financing Programs ("indirect lending") allow borrowers to make

a purchase and obtain financing at the same location.  (Doc. 80 at 6.)  In an indirect

lending transaction, the automobile dealership realizes additional profit by charging a flat

fee for referring loans to the credit union, or by charging the buyer an interest rate higher

than the credit union's rate.  (*Id.*)  ACU has participated in indirect lending programs with

automobile dealerships.  (Doc. 80 at 8.)

### TCUAFCU's Counterclaims

On August 9, 2005, ACU sued TCUAFCU pursuant to the Lanham Act, for unfair

competition, Alabama common law trademark infringement, and violation of the

Alabama Deceptive Trade Practices Act.  (Doc. 9.)  According to ACU, it has a

protectable interest in the name "Alabama Credit Union," and TCUAFCU's use of its

new name is likely to cause confusion.  (Doc. 9 at 3-6.)  ACU requests, among other things, that TCUAFCU be permanently restrained "from using Alabama Credit Union's mark 'Alabama Credit Union,' or variants thereof such as 'The Credit Union of Alabama,' 'Alabama Federal Credit Union,' or 'The Federal Credit Union of Alabama.'" (Doc. 9 at 11.)

In its answer, TCUAFCU asserted counterclaims against ACU and Latham.  (Doc. 13.)  TCUAFCU claims that Latham intentionally interfered with its business relations and conspired with ACU to intentionally interfere with its business relations.  (*Id.*)  TCUAFCU alleges the following claims against ACU: 1) cybersquatting; 2) intentional interference with business relations related to ACU's cybersquatting; 3) intentional interference with business relations, mail fraud, RICO violations, fraudulent suppression, and unfair competition related to ACU's indirect lending; and 4) conspiracy to intentionally interfere with TCUAFCU's business related to ACU's objections to TCUAFCU's name change.  (Doc. 13.)

## DISCUSSION

### I. Anticybersquatting and Consumer Protection Act

TCUAFCU announced its new name on March 26, 2005.  (Doc. 80 at 2.)  On March 28, 2005, ACU placed an order for registration of sixty-four (64) domain names containing various combinations of the words "Alabama," "Federal," "Credit," and "Union."  (Doc. 13 at 12-13.)  TCUAFCU alleges that ACU's actions amounted to

7

"cybersquatting."

The Cybersquatting Act, codified in § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d), provides:

> (A) A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person
>
> > (i) has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and
> >
> > (ii) registers, traffics in, or uses a domain name that--
> >
> > > (I)   in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
> > >
> > > (II)   in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
> > >
> > > (III) is a trademark, word, or name protected by reason of section 706 of Title 18 or section 220506 of Title 36.

15 U.S.C. § 1125(d).  In other words, "[l]iability for federal cyberpiracy occurs when a plaintiff proves that (1) its mark is a distinctive or famous mark entitled to protection, (2) the defendant's domain names are identical or confusingly similar to the plaintiff's marks, and (3) the defendant registered the domain names with the bad faith intent to profit from them.  *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F.Supp.2d 1213, 1218 (S.D. Fla.

2004) (citing *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001)).

Therefore, TCUAFCU must first show that its mark is "distinctive" or "famous." The Second Circuit has explained the difference between the terms "distinctive" and "famous":

> Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used – when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness.

*Sporty's Farm L.L.C. v. Sportsman's Market, Inc.*, 202 F.3d 489 (2d Cir. 2000). TCUAFCU's mark, which had been announced only two days before, was clearly not famous at the time ACU registered the domain names. *See, e.g., Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F.Supp.2d 1261 (S.D. Fla. 1999) ("Although Carnival has used the 'Fun Ship' slogan since the early 1970s and has spent millions of dollars promoting the mark nationally, the Court finds . . . that the Plaintiff's extensive advertising and sales are not sufficient to establish fame); *Michael Caruso and Co., Inc. v. Estefan Enterprises, Inc.*, 994 F.Supp. 1454 (S.D. Fla. 1998) (noting that a mark must rise to the level of Buick or Kodak to be considered famous). Consequently, TCUAFCU must show that its mark is distinctive.

In *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, the Eleventh Circuit noted that there are two ways in which a mark may become distinctive:

> [A] business does not automatically obtain rights in a mark by using it. A business will obtain rights in a mark upon first use only if the

9

mark is "inherently distinctive."  If the mark is not inherently distinctive, a business may obtain rights in the mark when it attains a secondary meaning.

*Investacorp*, 931 F. 2d 1519, 1522 (11th Cir. 1991).  *See also Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning").  Because TCUAFCU's mark had only existed for two days, it had clearly not acquired a secondary meaning at the time ACU registered for domain names.[3]  Consequently, TCUAFCU's mark was distinctive at the time ACU registered for domain names only if it is an "inherently distinctive" mark.

The Eleventh Circuit has provided a clear explanation of the four categories of distinctiveness:

> The distinctiveness of the mark at issue refers to how easily customers identify petitioner's mark with the represented services. There are four categories of distinctiveness listed in ascending order of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.  The demarcation between each category is more blurred than it is definite.  A term which suggests the basic nature of the service is generic and is typically incapable of achieving service mark protection because it has no distinctiveness.  A descriptive term merely identifies a characteristic or quality of a

---

[3]"[F]our factors can be considered in determining whether a particular mark has acquired a secondary meaning: 1) [T]he length and manner of its use; (2) the nature and extent of advertising and promotion; (3) the efforts made by the plaintiff to promote a conscious connection in the public's mind between the name and the plaintiff's . . . business; and (4) the extent to which the public actually identifies the name with the plaintiff's [service]."  *Id.* at 1425. Considering that TCUAFCU's name had only existed for two days, each factor weighs heavily in favor of finding that TCUAFCU's mark had not acquired a secondary meaning.

> service.  Because a descriptive service mark is not inherently
> distinctive, it may be protected only if it acquires a secondary
> meaning.  A suggestive term suggests the characteristics of the
> service "and requires an effort of the imagination by the consumer in
> order to be understood as descriptive."  Because a suggestive service
> mark is inherently distinctive, no proof of secondary meaning is
> required for it to be protectable.  An arbitrary or fanciful service
> mark is also inherently distinctive because the term bears no
> relationship to the service. Thus, such marks are protectable without
> proof of secondary meaning.

*Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.*, 934 F.2d 1551, 1559-
1560 (11th Cir. 1991).  TCUAFCU's mark is descriptive.  It requires no imagination in
order to understand that TCUAFCU is a credit union.  *See, e.g., Gift of Learning
Foundation, Inc. v. TGC, Inc.*, 329 F.3d 792, 799 (11th Cir. 2003) (plaintiff could not
prove that the mark "Drive Pitch & Putt" was inherently distinctive because the terms
were "merely descriptive of the activities taking place in Kids Golf's competitions").

TCUAFCU contends that ACU President Steve Swofford's "admission that
TCUAFCU's mark 'might be distinctive' . . . raises a factual issue concerning whether
TCUAFCU's *admittedly descriptive mark* may have a distinctive element."  (Doc. 87 at
26 [emphasis added].)  First, the court notes that an admission by TCUAFCU that its
mark is descriptive ends the inquiry into the mark's distinctiveness.  According to the
Eleventh Circuit, "[b]ecause a descriptive service mark is not inherently distinctive, it
may be protected only if it acquires a secondary meaning."  *Investacorp*, 931 F.2d at
1522.  TCUAFCU's mark had not acquired a secondary meaning at the time of ACU's
registration of the domain names, and therefore was not distinctive.  Second, Swofford's

11

comment, especially when considered in its complete context,[4] does not create an issue of fact as to whether TCUAFCU's mark amounted to a legally "distinctive" mark.  "The word 'distinctive' is a trademark law term of art simply meaning that the designation has achieved some degree of legal status as a mark."  4 McCarthy on Trademarks and Unfair Competition § 25:78.  Swofford's comment has no bearing on whether TCUAFCU's mark was legally distinctive for the purposes of TCUAFCU's Anticybersquatting and Consumer Protection Act ("ACPPA") claim.  *See Evans v. Tubbe*, 657 F.2d 661, 665 (5th Cir. 1981) ("At most, the plaintiffs' lay 'admissions' testimony illustrates only that these

---

[4]The following excerpt supplies the context for Swofford's quotation:

Q.  Does my client's name roll of your tongue fluidly, its current name?

A.  Not if you read the whole thing.

Q.  Do you mean not if you say the whole thing?

A.  Say the whole thing, The Credit Union of Alabama, Federal Credit Union, no, it doesn't.

Q.  You just about have to catch your breath , don't you?

MR. PAGE: Yes.

A.  Yes.

Q.  (MR. FREDERICK:) You don't have to catch your breath in saying ACU's name, do you?

MR. PAGE: Well, you used the word "ACU."  Now, I haven't been objecting to that, but we've understood that you've defined ACU to being Alabama Credit Union.

MR. FREDERICK: Right.

Q.  (MR. FREDERICK:)  Would you agree that my client's current name is so long that it is distinctive for that reason?

A.  Well, it might be distinctive if it were used all the time in its full – I mean, if it was to the full extent, but when it's used "Credit Union of Alabama" or "The Credit Union of Alabama" and that's – that – it becomes less distinctive from our name.

Q.  Without relationship to ACU's name, is my client's long-winded name distinctive?

A.  Used in its entirety more so than when it's used in its abbreviated version.

(Doc. 78, Ex. E at 231-32.)

non-lawyers misunderstood the legal term of art").

TCUAFCU attempts to rely on *GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F.Supp.2d 610 (E.D. Va. 2003), as an example of a violation of the Anticybersquatting and Consumer Protection Act where "the registrant had registered the domain name 'globalsantafe.com' less than one day after the public announcement of a merger that was to form a new company." (Doc. 87 at 27.) The new company was to do business under the name 'GlobalSantaFe Corporation.'" (Doc. 87 at 27.) TCUAFCU contends that the cases are similar because, "[a]t the time of registration of the domain name, the plaintiff was not doing business under that name, the merger had not been consummated . . . and the plaintiff had not filed any federal trademark application to register the new mark." (Doc. 87 at 27.) However, *GlobalSantaFe* is clearly distinguishable from the instant case. The court in *GlobalSantaFe* held:

> The complaint establishes facts sufficient to show that the GLOBAL MARINE trademark was registered by Global Marine in 1969 and that Santa Fe developed common law trademark rights in the SANTA FE mark through its continuous use of the mark for over fifty years, during which time customers came to associate the mark with Santa Fe's services. GlobalSantaFe inherited those rights upon the merger of the two companies.

*GlobalSantaFe*, 250 F.Supp.2d 610, 616 (E.D. Va. 2003). In other words, the new mark was distinctive because the two companies that existed before the merger had developed rights in their respective marks, which became part of the new mark. *Id.* In the present case, TCUAFCU's mark was a completely new invention, not a combination of

13

previously established marks.

Because TCUAFCU's mark is not inherently distinctive, and had not acquired a secondary meaning at the time ACU registered for the domain names, TCUAFCU cannot establish that its mark is entitled to protection. Therefore, ACU's Motion for Summary Judgment is granted as to TCUAFCU's Anticybersquatting and Consumer Protection Act claim.

## II. Intentional Interference With Business Relationship Related to Cybersquatting

TCUAFCU also alleges that ACU's registration for domain names that were confusingly similar to its name was "intentional interference with TCUAFCU's existing relationship with its existing owner/members." (Doc. 87 at 29.) TCUAFCU must prove five elements to maintain a claim for intentional interference with contractual or business relations: (1) the existence of a contract or business relation; (2) defendant's knowledge of the existence of that relationship; (3) intentional interference in the relationship by the defendant; (4) an absence of justification for the interference; and (5) damage to the plaintiff as the result of defendant's interference. *Chrysler Capital Corp. v. Lavender*, 934 F.2d 290, 294 (11th Cir. 1991) (citing *Gross v. Lowder Realty Better Homes and Gardens*, 494 So.2d 590, 597 (Ala.1986)).[5] In addition, a plaintiff must show "some evidence of fraud, force, or coercion on the defendant's part." *Joe Cooper & Assocs., Inc.*

---

[5]"The fourth element of a claim for tortious interference with business relations, the absence of justification, actually relates to an affirmative defense to be pleaded and proved by the defendant." *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1257 (11th Cir. 2002).

*v. Cent. Life Assurance Co.*, 614 So.2d 982, 986 (Ala. 1992) (citing *Griese-Traylor Corp. v. First Nat'l Bank of Birmingham*, 572 F.2d 1039, 1045 (5th Cir. 1978)).

"As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement that in all probability would have been completed if the defendant had not interfered." 45 *Am. Jur. 2d Interference* § 4.  TCUAFCU argues that ACU interfered with TCUAFCU's relationship with its existing owner/members.  However, TCUAFCU has not offered evidence of any understanding or agreement that would have been completed had ACU not registered the domain names.  Therefore, TCUAFCU cannot establish a claim of intentional interference with a business relationship.

TCUAFCU's claim also fails for lack of damages.  In defining the scope of this cause of action, Alabama courts have relied on the Restatement (Second) of Torts.  *See, e.g., Ex parte Alabama Dept. of Transp.*, 764 So.2d 1263, 1270 (Ala. 2000); *Barber v. Business Prods. Center, Inc.*, 677 So.2d 223, 228 (1996).  "The Restatement divides recoverable damages for tortious interference into three categories: (1) the pecuniary loss of the benefits of the contract or the prospective relation; (2) consequential losses for which the interference is a legal cause; and (3) emotional distress or actual harm to reputation if either is reasonably to be expected to result from the interference." *KW Plastics v. U.S. Can Co.*, 131 F.Supp.2d 1265 (M.D.Ala. 2001).  TCUAFCU has not offered any evidence that ACU's registration of domain names caused any pecuniary loss,

15

consequential losses, emotional distress, or actual harm to reputation.  At the most, TCUAFCU has speculated that ACU's registration might have caused its members to mistakenly go to a blank website.  This allegation, even if true, does not establish the damage element of a prima facie case for intentional interference with a business relationship.

TCUAFCU's claim also fails for lack of evidence of fraud, force, or coercion.  "In addition to the five elements that a plaintiff must establish for the tort of interference with contracts or business relationship, the plaintiff 'must [also] produce substantial evidence of fraud, force, or coercion, on the defendant's part.'"  *Barber v. Bus. Prods. Ctr., Inc.*, 677 So.2d 223, 227 (Ala.1996); *U.S. Steel, LLC, v. Tieco, Inc.*, 261 F.3d 1275, 1292 (11th Cir. 2001) (incorporating fraud, force, and coercion limitation into analysis of interference with business relations claim arising under Alabama tort law).  TCUAFCU has not offered any evidence that ACU's registration of domain names amounted to fraud, force, or coercion.

Therefore, ACU's Motion for Summary Judgment is due to be granted as to TCUAFCU's intentional interference claim.

## III.  Indirect Lending Claims

According to TCUAFCU, Counts I, V, and VI "arise from ACU's confessed practice of participating in a Credit Union Administration Company ('CUAC') indirect

lending program."[6]   (Doc. 87 at 30.)  TCUAFCU claims that ACU allows dealerships to "mark up new members' interest rates for [their automobile] financing without disclosing that compensation or the mark-up under circumstances that give rise to a duty on the part of ACU to give its car-buying members full disclosure of the kickback." (*Id.*)  TCUAFCU alleges that ACU's practice of indirect lending resulted in intentional interference with TCUAFCU's business, RICO violations, fraudulent suppression, and unfair competition. (Doc. 13.)

However, TCUAFCU lacks standing to challenge ACU's indirect lending practices.  To have standing, a plaintiff must show that: "(1) [it] ha[s] suffered an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely that the injury may be redressed by judicial action."  *Florida Public Interest Research Group Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004).  "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'"  *Id.* (quoting *Bischoff v. Osceola County, Fla.*,

---

[6]Count I alleges that ACU intentionally interfered with TCUAFCU's business relationship with its members by "concocting, implementing and practicing its fraudulent kickback scheme."  (Doc. 13 at 19.)  Count V alleges that ACU's "fraudulent kickback scheme" resulted in mail fraud and racketeering violations of RICO.  (Doc. 13 at 20.)  Count VI alleges that ACU "intentionally interfered with TCUAFCU's business and engaged in unfair competition with TCUAFCU in violation of state law and . . . the Langham Act . . . and RICO."  (Doc. 13 at 22.)

222 F.3d 874, 878 (11th Cir. 2000)).  Therefore, when standing is raised at the summary

judgment stage, a plaintiff may no longer rest on "mere allegations."  *Id.*  Instead, a

plaintiff "must set forth by affidavit or other evidence specific facts which for purposes of

the summary judgment motion will be taken to be true."  *Id.*

TCUAFCU contends that it suffered an injury in fact because ACU's indirect

lending practices and alleged misrepresentations deprived TCUAFCU of the opportunity

to "satisfy the needs of its owners/members such as Walter Gregory by financing their

purchase of vehicles at lower interest rates."  (Doc. 87 at 37.)  TCUAFCU's allegation

alone fails to establish that it has suffered an "injury that is concrete and particularized

and actual or imminent."  *See Florida Public Interest Research Group*, 386 F.3d at 1083.

Any injury suffered by TCUAFCU as a result of ACU's indirect lending practices is

conjectural and hypothetical, and therefore insufficient to establish standing.  *See id.*

Furthermore, even assuming that TCUAFCU's allegation would constitute a

"concrete and particularized" injury, TCUAFCU has not offered any evidence that

Gregory actually received a "marked up" loan.  On the other hand, ACU has submitted

the declaration of Kayce Bell, the Chief Operating Officer of ACU.  (Doc. 95, Ex. 2.)

According to Bell, ACU's records show that Gregory received a 5.25% rate from

Tuscaloosa Chevrolet, which was the same rate he would have obtained had he directly

applied for membership with ACU.  (*Id.*)  Because TCUAFCU has not established that

Gregory received a "marked up" loan, it has not established that it was "deprived" of the

opportunity to "satisfy the needs of its owners/members." (Doc. 87 at 37.) Consequently, TCUAFCU has not shown that it was injured, and lacks standing. Therefore, summary judgment is due to be granted as to Counts I, V, and VI, which arise from ACU's indirect lending practices.[7]

Although ACU has not shown that it suffered an injury in fact, it claims that it has organizational standing to assert claims on behalf of its members. (Doc. 87 at 37.) The Supreme Court has explained that "[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 181 (2000). In the instant case, the claims asserted require the participation of individual members in the lawsuit. TCUAFCU acknowledges that indirect lending is not per se unlawful, and that ACU was not automatically required to disclose the existence of its indirect lending relationship

---

[7]TCUAFCU lacks standing to bring a RICO action against ACU for an additional reason. A direct relationship between the injury and the alleged wrongdoing is a "central element" to maintaining a civil action under RICO. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 269 (1992). "Thus, a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover." *Id.* at 268-69. In the instant case, TCUAFCU complains of harm flowing from "misfortunes [allegedly] visited upon a third person [Walter Gregory] by the defendant's acts." *See id.* Therefore, even if TCUAFCU had offered evidence that Gregory received a "marked up" loan, any resulting injury to TCUAFCU would be too remote. Consequently, TCUAFCU clearly lacks standing to maintain a civil action under RICO.

with automobile dealerships.  (Doc. 87 at 32.)  However, TCUAFCU claims that special

circumstances, namely "stated misrepresentations" by ACU, imposed a duty to disclose

the existence of the indirect lending arrangement.  (*Id.*)  Without the participation of its

members, TCUAFCU cannot show that misrepresentations were made to its members or

that its members relied on those misrepresentations.  In other words, the claims asserted

require the participation of TCUAFCU's individual members.  Therefore, TCUAFCU

does not have organizational standing to assert claims related to ACU's indirect lending.

Even assuming that TCUAFCU has standing, its indirect lending claims fail as a

matter of law.  Indirect lending is a practice whereby automobile dealers receive "a

percentage of their customers' finance charges when they assign their retail installment

sales contract to finance companies."  T. Barnett and G. Lewis, *Are Automobile*

*Financing and Other Credit Transactions that Comply with the Federal Truth-In-Lending*

*Act Subject to Private Rights of Action Under the Tennessee Consumer Protection Act?*,

71 Te.. L. Rev. 695, 696 (Summer 2004)).  The result of the automobile dealers' receipt

of a percentage of the charges is that the customer pays a higher APR than the customer

would pay if she arranged her financing directly with the financing company.  *Id.*  No

statutory duty requires the disclosure of such commission agreements to the customer.

*See Ex parte Ford Motor Credit Co.*, 717 So.2d 781, 786 (Ala. 1997) ("Neither the

Alabama Mini-Code nor the Federal Truth-in-Lending Act requires such a disclosure").

However, "special circumstances" may impose a common law duty upon the seller to

20

reveal the existence of such agreements to the customer.  *See id.* at 787.

Ala. Code § 6-5-102 provides:

> Suppression of a material fact which the party is under an obligation
> to communicate constitutes fraud.  The obligation to communicate
> may arise from the confidential relations of the parties or from the
> particular circumstances.

Ala. Code § 6-5-102 (1975).  In the present case, no confidential relationship existed between ACU and the automobile dealerships' customers.  *See, e.g., Ford Motor Credit Co.*, 717 So. 2d at 786-87.  Therefore, only particular circumstances could have created such a duty.  The Alabama Supreme Court has stated:

> A duty to disclose may arise from the particular circumstances of the
> case.  Those circumstances include (1) the relationship of the parties;
> (2) the relative knowledge of the parties; (3) the value of the
> particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5)
> the customs of the trade; and (6) other relevant circumstances.

*State Farm Fire & Cas. Co. v. Owen*, 729 So.2d 834, 842-43 (Ala.1998).

According to TCUAFCU, the particular circumstances in the instant case are "stated misrepresentations" by ACU.  (Doc. 87 at 32.)  TCUAFCU alleges two misrepresentations: 1) ACU's website, which states: "We reimburse the dealerships for their expense in handling our paperwork for us at no direct cost to you"; and 2) a statement by a participating dealer to TCUAFCU customer Walter Gregory "that ACU had the cheapest (meaning the lowest) interest rate for financing [Gregory's] purchase, which was not true because the rate he was charged was higher than the rate he could have obtained from TCUAFCU."  (Doc. 87 at 32-33.)

21

TCUAFCU has offered the declaration of one individual, Walter Gregory, who claims that he would have acted differently had he known of the practice of indirect lending.  However, TCUAFCU has offered no evidence that Gregory actually received a "marked up" loan.  On the other hand, ACU offers the declaration of Kaye Bell, the Chief Operating Officer of ACU.  (Doc. 95, Ex. 2.)  According to Bell, records show that Gregory received a 5.25% rate from Tuscaloosa Chevrolet, which was the same rate he would have obtained had he directly applied for membership with ACU.  (*Id.*)

Because there is no evidence that Gregory received a "marked up" loan, TCUAFCU cannot raise a material issue of genuine fact as to its indirect lending claims, which are based on the idea that ACU had a duty to disclose the existence of its commission agreement with the dealership.  Therefore, summary judgment is due to be granted as to Counts I, V, and VI, which relate to ACU's indirect lending practices.

## IV. Conspiracy to Intentionally Interfere with Business

Conspiracy requires a concerted action by two or more to achieve an unlawful purpose or a lawful purpose by unlawful means.  *Luck v. Primus Automotive Financial Services, Inc.*, 763 So.2d 243, 247 (Ala. 2000).  In order to prove conspiracy, a plaintiff must show that the defendant agreed with at least one other coconspirator.  *See Eidson v. Olin Corp.*, 527 So.2d 1283 (Ala. 1988).  Furthermore, the agreement must be to achieve an unlawful purpose or a lawful purpose by unlawful means.  *See id.*

TCUAFCU has offered no evidence that Latham and ACU agreed to achieve an unlawful purpose or an unlawful purpose by unlawful means.  Even if they agreed to object to

TCUAFCU's name change, TCUAFCU has presented no evidence that the act of objecting to the name change was unlawful.

Furthermore, "[l]iability for civil conspiracy rests upon the existence of an underlying wrong and if the underlying wrong provides no cause of action, then neither does the conspiracy." *Willis v. Parker*, 814 So.2d 857, 867 (Ala. 2001).  As discussed above, TCUAFCU's intentional interference claim fails as a matter of law.  Therefore, there is no "underlying wrong" upon which to base a conspiracy claim.

## **CONCLUSION**

Therefore, upon careful review of the record, the arguments presented in the briefs of the parties, and oral argument of counsel, the court concludes that there are no material facts in dispute and defendant is entitled to judgment as a matter of law.  An order granting defendant's motion for summary judgment will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 13th day of August, 2007.


*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE